**Jennifer M. LISTON and Brian D. Gogola, Plaintiffs,**

v.

**Pam STEFFES, Keith Hurlbert, Phillip A. Schafer, Edward M. Vacha and County of Iowa, Defendants.**

No. 01–C–0607–C.

United States District Court, W.D. Wisconsin.

Aug. 30, 2002.

T. Chris Kelly, Madison, WI, for Plaintiff.

Charles H. Bohl, Whyte, Hirschboeck, Dudek, S.C., Milwaukee, WI, for Defendants.

## OPINION AND ORDER

CRABB, Chief Judge.

Plaintiffs Jennifer Liston and Brian Gogola are suing under 42 U.S.C. § 1983 for money damages to compensate them for allegedly unconstitutional arrests and strip searches that took place on February 3, 2001. Jurisdiction is present. 28 U.S.C. § 1331.

The case is before the court on a motion for summary judgment of defendants Iowa County and sheriff's deputies Pam Steffes, Keith Hurlbert and Phillip A. Schafer. The moving defendants contend that they were legally justified in stopping the car driven by plaintiff Gogola, detaining the occupants while administering breathalyzer tests and searching the vehicle, arresting plaintiffs and two other passengers, taking them to the sheriff's department for booking and subjecting them to strip searches. Alternatively, defendants contend that if defendants Schafer, Steffes and Hurlbert acted unconstitutionally, they are entitled to qualified immunity because they did not violate plaintiffs' clearly established constitutional rights of which reasonable persons would have been aware. Defendant Iowa County moves for dismissal on the ground that none of its employees acted wrongfully and because plaintiffs cannot show that any of the alleged wrongs to which they were subjected occurred as a result of a county policy or practice.

I conclude that a reasonable jury could find that defendant Schafer stopped plaintiffs' car without reasonable suspicion but that he is immune from a suit for damages for his actions because a reasonable officer could have believed the stop to be legal. Taking a favorable view of the facts alleged by plaintiffs, a jury could find that defendant Schafer violated plaintiffs' rights in additional ways by administering breath tests, prolonging the stop for that purpose, searching plaintiffs' car and arresting plaintiffs and that he lacks immunity for those actions. I conclude that a jury could find that defendants Steffes and Hurlbert subjected plaintiffs to illegal strip searches but could find that reasonable officers would have made the same decision to search in the same circumstances. If the jury makes these findings, defendants Steffes and Hurlbert would be immune to an award of damages. Defendants' motion for summary judgment will

be granted as to plaintiffs' claim that their car was stopped illegally. It will be denied in all other respects.

From the facts proposed by the parties, I find that the following are material and not disputed.

## UNDISPUTED FACTS

On February 3, 2001, defendant Pam Steffes was employed as a jailer/dispatcher by the Iowa County Sheriff's Department; defendant Keith Hurlbert was employed by the county as a jailer and defendant Schafer was employed as a sheriff's department patrol officer. Defendant Edward Vacha was a Wisconsin State Patrol Officer.

Defendant Vacha has received training from the state of Wisconsin in the area of narcotics investigation and drunk driving violations. He has received additional training from other sources in drug indiction, drug carrier profiling and drug transportation. He has had extensive experience in dealing with drugs and drug distribution and is familiar with the smell of both burnt and dry marijuana.

On Saturday, February 3, 2001, defendant Schafer was patrolling eastbound on U.S. Highway 18 in the township of Eden in a marked Iowa County squad car. The roads were snow-covered and snow was falling. At about 10:27 p.m., he observed a car coming out of the F.S. Coop fertilizer plant at 8–10 miles an hour, which he considered an excessive speed, and heading west on Highway 18. The plant was not open at the time. Defendant Schafer was aware of a number of burglaries of feed mills, one store and a gas station in the preceding year in Iowa County, but he had no reason to believe that any burglary had occurred at the F.S. Coop plant that night. There had been no robbery or other crime at a feed mill since the preceding July.

The F.S. Coop fertilizer plant consists of buildings, scales, fuel tanks and a parking lot. It has no "no trespassing" signs or any other sign restricting entry to the property. There is no fence around the property and no gate at the main entrance.

Before defendant Schafer activated his emergency lights, he pursued the car for about a mile, during which time he saw no violation of any traffic law. Once his lights went on, the car pulled over to the side of the road and stopped. Schafer approached and saw six people in the car. He asked all the occupants for identification; three of them had some but the others had to write their names on paper. Defendant Schafer asked the driver (plaintiff Gogola) and the passengers whether anyone had been drinking. All answered no. He asked why they had been in the coop parking lot. Gogola told him they had gone in there to urinate.

Defendant Schafer called the sheriff's department dispatch to advise it of his location and obtain information about the vehicle's registration and its occupants. The dispatcher advised Schafer that one passenger, Michael Guillen, was listed as wanted and named in an outstanding arrest warrant from Grant County and that another, Patricia Brown, was only 15 years old. The dispatcher was "working to confirm the warrant with Grant County." Defendant Schafer directed Brown to get out of the car and asked her whether her mother knew where she was and what her mother's telephone number was. He telephoned Brown's mother, who said that Brown's friends should bring her straight home. Defendant Schafer told Brown to return to his vehicle and to sit in the back seat.

Defendant Schafer radioed Wisconsin State Trooper Bryant Russell for assistance because he knew Russell was in the area. After Russell arrived, defendant

Schafer asked Michael Guillen to get out of the car. As Guillen did so, Schafer detected a strong odor of intoxicants coming from him and from the car. He and Russell escorted Guillen to Schafer's squad car. Schafer gave Guillen a preliminary breath test, which indicated a blood alcohol level of 0.13. Because Guillen was only 20, defendant Schafer arrested him for underage drinking, handcuffed his hands behind his back and placed him in the rear seat of the squad car. Under Wisconsin law, underage drinking is a civil offense, punishable by a forfeiture.

Defendant Schafer went back to the car and asked plaintiff Liston whether she had been drinking. Although she said no, he administered a preliminary breath test to her, which showed a blood alcohol level of 0.02. He placed her under arrest for underage drinking and seated her in the rear of his squad car.

Defendant Schafer asked another passenger, Feather Guillen, and Brown to take preliminary breath tests. Their tests proved negative.

Defendant Schafer called dispatch to ask for more squad cars to transport the arrested persons to the sheriff's department. After passenger LaDell Pope agreed to submit to a preliminary breath test that showed 0.05, defendant Schafer arrested him for underage drinking and placed him in the rear of Schafer's squad car. (Presumably some of the people assigned to the rear seat of Schafer's squad were redistributed before Pope was added to the mix.)

Defendant Schafer asked plaintiff Gogola to submit to a preliminary breath test, which produced results negative for alcohol. Another officer (deputy Carey) asked Gogola whether he could search Gogola's car and was told "he'd rather not." Defendant Schafer then asked plaintiff Gogola to get out of the car and report to Carey at the rear of the vehicle. (It is unclear which vehicle this was. I assume that it was Carey's rather than Schafer's overcrowded squad car.) Carey told plaintiff Gogola that the officers did not need Gogola's consent to search his car because the search was incident to an arrest.

Defendant Schafer searched plaintiff Gogola's car with the assistance of defendant Vacha, who detected an odor of burnt marijuana in the car. Schafer detected no such odor. Vacha did not tell Schafer he had smelled marijuana. Vacha found a baggie underneath or near the front passenger seat containing shredded tobacco that might have come from a cigar. He knew from his experience that cigars can be used to ingest marijuana and that marijuana smokers often use cigars to make "blunts," or hollowed out cigars stuffed with marijuana instead of tobacco. Loose or shredded cigar tobacco is a byproduct of the construction of a blunt.

During the search, defendant Schafer discovered a bottle of Tanqueray gin on the floor near the driver's seat. The bottle contained about one inch of liquid and its seal was broken. When plaintiff Gogola said that the bottle was his, defendant Schafer arrested him for transportation of open intoxicants in a motor vehicle. Under Wisconsin law, this offense is a civil offense, punishable by a forfeiture. Defendant Schafer handcuffed plaintiff Gogola behind his back; defendant Vacha transported him to the Iowa County Sheriff's Department. Deputy Carey handcuffed plaintiff Liston, put her in the back of his squad car and took her down to the sheriff's department. Defendant Schafer took Michael Guillen and Pope to the department.

Defendants Hurlbert and Steffes were working as jailers on February 3. Defendant Vacha was the first officer to arrive. He told Steffes that he had detected an odor of marijuana but that a search of the

car and pat-down searches performed at the scene of the arrest had not turned up any actual marijuana. He did not give defendant Steffes any other information about plaintiffs. He never gave defendant Hurlbert any indication that he had located any drugs or drug paraphernalia or evidence of drug consumption.

Defendants Steffes and Hurlbert decided that the four arrested persons had to be strip searched. Hurlbert patted plaintiff Gogola down and found nothing. He then took Gogola into a locker room just off the booking room. The locker room is private. It has no windows and only one door, which was locked during the search. No one else was present during the search. Defendant Hurlbert first searched all of plaintiff Gogola's loose outer clothing, then asked him to remove his remaining clothing: shirt, then pants and then underwear. Defendant Hurlbert had plaintiff Gogola take off his socks and turn them inside out. He told Gogola to turn around 360 degrees and bend over. Defendant Hurlbert found no contraband in Gogola's possession.

While defendant Hurlbert was searching plaintiff Gogola, defendant Steffes patted down plaintiff Liston. During the pat down, she smelled no unusual odor coming from Liston. She did not see or detect anything to lead her to believe that plaintiff possessed contraband. Nevertheless, she took plaintiff Liston into the south holding cell to the immediate left of the booking room for a strip search. The south holding cell has one booking window, which is covered by a metal covering, and another window in the door that is covered with paper. Steffes held the door nearly shut rather than closing it altogether because it would have locked if closed. She asked plaintiff Liston to remove all of her clothing, then checked each item. She told plaintiff to remove her bra and turn it inside out and then lower her underpants. She lifted plaintiff's breasts to see whether

anything would fall; she had plaintiff bend over for a visual inspection; and she patted down plaintiff's arms, underarms and sides but found nothing in her possession. After plaintiff dressed again, defendant Steffes locked her in a holding cell. Plaintiff Liston had not smoked marijuana on February 3, 2001, and she did not smell like marijuana.

Defendant Hurlbert patted down and searched both Michael Guillen and Pope in the same manner as he had searched plaintiff Gogola. He found nothing on Gogola but did find a small clear plastic bag containing marijuana when it fell from between Pope's buttocks while he was being searched.

Pursuant to the Iowa County Sheriff's Department jail policy, a person who is brought to the jail after having been arrested for no offense other than having an open intoxicant in a vehicle would not be admitted to the jail as an inmate but would be released after booking. Pursuant to the same policy, a person brought to the jail after having been arrested for no offense other than underage drinking would not be admitted to the jail as an inmate but would be released after booking. A person who has been arrested and booked might be held at the sheriff's department for a short time in a number of different rooms while awaiting release. Pursuant to jail policy, general population inmates are not in any of those rooms while persons who are being released are being held there.

Plaintiff Liston was released at about 1:04 a.m. on February 4, 2001; plaintiff Gogola was released at about 2:10 a.m.

## OPINION

Plaintiffs' allegations raise a number of claims involving violations of their Fourth Amendment right to be free from unreasonable searches and seizures: 1) defen-

dant Schafer stopped their vehicle without reasonable suspicion; 2) he prolonged the initial stop unreasonably to administer preliminary breath tests in the absence of any articulable facts supporting an objective and particularized suspicion that plaintiffs had violated any law; 3) he arrested plaintiff Liston for underage drinking in accordance with Iowa County policies, practices and custom, without investigating whether she had consumed the alcohol in her parents' presence, in which case she would not have committed a crime; 4) defendant Vacha misrepresented to defendants Steffes and Hurlbert that he had smelled marijuana, knowing that this misinformation would cause them to search plaintiffs; and 5) defendants Steffes and Hurlbert subjected plaintiffs to strip searches although they did not have articulable facts supporting an objectively reasonable and particularized suspicion that either plaintiff possessed controlled substances, weapons or other contraband and conducted plaintiff Liston's search in a place where she could be seen by others while the search was occurring.

A threshold issue needs to be addressed. If either or both plaintiffs were convicted of a crime arising out of the February 3 arrests and their convictions would be put into doubt if this court was to decide that the initial stop of their car, the search of the car or the administration of a preliminary breath test was illegal, they would be barred from bringing this challenge by *Heck v. Humphrey,* 512 U.S. 477, 486, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). *Heck* holds that no one can recover damages under 42 U.S.C. § 1983 for an unconstitutional conviction or imprisonment caused by actions whose unlawfulness would render a conviction or sentence invalid unless he can prove that the conviction or sentence has been reversed, expunged or declared invalid. No party has suggested that either plaintiff was ever charged with a crime as a result of the incident on

February 3 or subjected to any further action by Iowa County or the state of Wisconsin. Therefore, I will assume that there is no procedural bar to plaintiffs' pursuit of this action.

1. *Initial stop of plaintiffs' car*

█ When defendant Schafer activated his emergency lights, requiring plaintiff Gogola to pull over to the side of the road and stop, he was "seizing" the car and its occupants within the meaning of the Fourth Amendment. *Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) ("stopping an automobile and detaining its occupants constitute a 'seizure' within the meaning of [the Fourth and Fourteenth Amendments], even though the purpose of the stop is limited and the resulting detention quite brief"). He was entitled to make such a seizure only if he had " 'specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion.' " *Id.* at 655–56, 99 S.Ct. 1391 (quoting *United States v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975)). The "facts are 'judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate?' " *United States v. Tilmon,* 19 F.3d 1221, 1224 (7th Cir.1994) (quoting *Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

█ In evaluating the reasonableness of a *Terry* stop, courts consider "the totality of circumstances known to the officers at the time of the stop." *United States v. Jackson,* 300 F.3d 740, 745 (7th Cir.2002) (quoting *United States v. Quinn,* 83 F.3d 917, 921 (7th Cir.1996)). "This includes the 'experience of the law enforcement agent and the behavior and characteristics

of the suspect.' *United States v. Odum,* 72 F.3d 1279, 1284 (7th Cir.1995). An officer may also consider whether the location of the stop is a 'high crime area.' *United States v. Brown,* 188 F.3d 860, 865 (7th Cir.1999)." *Jackson,* 300 F.3d at 745.

■ A reasonable jury could find that defendant Schafer lacked sufficient suspicion to stop the car. Although he had reason to note the vehicle's presence in the parking lot of a closed fertilizer plant late on a Saturday night, when the plant was closed and other similar facilities had been burglarized much earlier that year, nothing about the car except its location and what seemed to Schafer to be excessive speed would have given him reason to suspect an improper purpose. It was not particularly late at night and the car did not take any evasive action once Schafer came into view. As plaintiffs point out, there were many innocent reasons why the car might have pulled off the road at that spot: to make a turn in its direction; to change drivers; to consult a map; or to take a break from driving. Defendants do not suggest that the plant was located in a "high crime area," that is, one in which there is a high incidence of criminal activity. *See, e.g., Brown,* 188 F.3d at 863 (area was one with drug and gang activity and had been scene of several recent shootings).

Defendants are asking the court to hold as a matter of law that a police officer has the legal authority to make an investigative stop of any car at any time simply because the officer characterizes it as being in a place it should not be, with no additional basis for believing that criminal activity is afoot. Defendants have not cited any case in which a court has upheld an investigative stop in the circumstances defendant Schafer confronted. My own research has disclosed none. In *United States v. Briggman,* 931 F.2d 705 (11th Cir.1991), for example, the court held an investigative stop legal when the officer saw the defendant parked in parking lot at 4:00 a.m. in a high crime area, when the commercial establishments were closed for the night and when the officer observed the defendant pull away from the area as soon as the officer drove past the lot a second time. Although these facts are similar to those in this case, there are three important differences: the high crime area, the early morning hour, when fewer people would be out and around and therefore a criminal would think himself less likely to be detected, and the defendant's apparent reaction to seeing the officer return to check on him. In this case, there is no evidence that the driver of the car made his decision to leave or sped up when seeing Schafer. In *United States v. Walker,* 924 F.2d 1 (1st Cir.1991), the court upheld an investigative stop when the officer had seen a truck parked behind a lumber yard at 2:30 a.m.; he had never seen a delivery at the yard that early in the morning; he observed two men, one in the cab of the truck and the other watching the parking lot fence; the truck's trailer was filled with lumber and pulled off into the woods; and the officer knew of previous early morning burglaries at the same site and elsewhere in the area. In *State v. Johnson,* 253 Kan. 75, 853 P.2d 34 (1993), an officer was held to have had reasonable suspicion to make an investigative stop of a car parked behind a grocery store at 7:26 a.m., when the store was not open. In that case, however, the car had reacted to the officer's arrival by driving away with "extreme caution" as if to avoid attention, but with its truck lid ajar and bouncing. *See also United States v. Mattarolo,* 209 F.3d 1153 (9th Cir.2000) (upholding stop of pickup truck that officer saw at midnight backing out of driveway of fenced construction storage area with three-foot crate in back of the truck; officer knew that business kept crated items

in storage yard; and officer had been involved previously in recovery of stolen cars and in drug and burglary arrests in immediate vicinity); *United States v. Dawdy,* 46 F.3d 1427 (8th Cir.1995) (officer had reasonable suspicion to stop vehicle parked in pharmacy lot at 10 p.m., after business closed, with lights off, when car began to leave lot as soon as officer entered it and took evasive action when officer left his squad car and held his hand up to indicate that driver should stop and officer was aware of numerous apparently false burglary alarms at pharmacy in recent past); *Losee v. Dearinger,* 911 F.2d 48 (8th Cir. 1990) (reasonable suspicion created by vehicle parked behind closed convenience store with lights off, in illegal position near alley that had been escape route for past robberies of convenience store, when, on two occasions, vehicle drove away as soon as police arrived).

Courts have found stops illegal in circumstances similar to those in this case. In *People v. Deppert,* 83 Ill.App.3d 375, 38 Ill.Dec. 675, 403 N.E.2d 1279 (1980), the Illinois supreme court declined to uphold an investigative stop by an officer who had seen a car driving slowly past a bar, about 4:00 a.m., proceed into a parking lot, turn around and start back out of lot. The officer drove up alongside the car and asked the driver whether he was lost and needed help. The court held that when the officer asked those questions he had no reasonable suspicion to stop the vehicle because the facts suggested that the driver had hoped to go to the bar and had merely turned around after finding the bar closed. In *People v. Freeman,* 413 Mich. 492, 320 N.W.2d 878 (1982), the Michigan supreme court found that an officer had no reasonable suspicion to make a *Terry* stop of a car parked near a darkened house at 12:30 a.m. with its lights on and motor running in a private parking lot adjoining a race track. In *State v. Carter,* 232 Neb. 666, 441 N.W.2d 640 (1989), the Nebraska su-

preme court found no reasonable suspicion existed for stopping a vehicle that was seen at 12:15 a.m., leaving an office area that had been the scene of a number of burglaries, although no businesses were open at time and the officer testified that it was unusual for the area to have traffic during the night. The court noted that the officer had no report of a burglary for that night and no burglaries had taken place in the preceding two months. *See also State v. Donahue,* 251 Conn. 636, 742 A.2d 775 (1999) (insufficient evidence for *Terry* stop of vehicle that turned abruptly into vacant lot of closed private club at 1:50 a.m., parked, left motor running and then repositioned car so that it faced exit of building, which was located near public housing area that had been experiencing increase in drug and prostitution offenses).

When defendant Schafer stopped plaintiffs' car on February 3, he had less information than the officers whose stops were upheld and no more information than the officers had in the cases cited above in which the stops were held illegal. He had no evidence of a traffic violation. In these circumstances, a reasonable jury could find that his hunch about the vehicle did not add up to a reasonable suspicion that would have justified his stop of the car, given all the legitimate reasons why a car might pull off the highway into a parking lot.

Defendants argue that *Pliska v. City of Stevens Point, Wisconsin,* 823 F.2d 1168 (7th Cir.1987), supports Schafer's stop of the car as a matter of law, but *Pliska* is readily distinguishable. In that case, when the officer seized Pliska, he knew from a neighbor who had called the police department to report Pliska's activities that Pliska had been walking around a residential neighborhood in daylight in a suspicious manner, stopping and taking pictures and making notes, that the neigh-

borhood had had two recent daytime burglaries, that Pliska had refused to explain himself when the neighbor had asked him what he was doing and that when the officer had tried to speak to him, Pliska had kept walking, told the officer to "go to hell" and refused to identify himself or answer any questions from the officer. Plaintiffs Gogola and Liston exhibited no similar behavior. They did not try to flee, drive evasively or give any other indication of guilt as Pliska did before he was seized.

Although a jury could find that defendant Schafer's seizure of plaintiffs' car was illegal, it does not follow that defendant Schafer is liable to plaintiffs for stopping their car. Public employees are protected from suits for damages by the doctrine of qualified immunity, which shields them from civil damages liability "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Qualified immunity represents an accommodation of the conflicting concerns of providing remedies for persons injured as a result of a public official's abuse of his office, thus vindicating constitutional guarantees, and insuring that "fear of personal monetary liability and harassing litigation," *id.*, does not unduly inhibit officials in the discharge of their duties.

Qualified immunity is an affirmative defense. To establish defendant Schafer's entitlement to this defense, defendants must show that his conduct did not violate plaintiffs' clearly established constitutional rights of which reasonable persons would have been aware. *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). The test is an objective one: the court looks at the state of the law at the time of the challenged incident, not at what the particular defendants knew about the law. The state of the law must

be clear, so that "officers are on notice their conduct is unlawful.'" *Hope v. Pelzer*, 536 U.S. 730, 122 S.Ct. 2508, 2515, 153 L.Ed.2d 666 (2002) (quoting *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). In deciding the issue of qualified immunity, courts are to engage in two inquiries: First, would a constitutional right have been violated on the facts alleged, taking those facts in the light most favorable to the party asserting injury and second, was the right clearly established, with sufficient specificity to give defendants fair notice? *Saucier*, 121 S.Ct. at 2155, 2156.

As I have explained, a reasonable jury could find that defendant Schafer violated plaintiffs' rights by stopping their car without reasonable suspicion. However, I cannot say that a reasonable officer in defendant Schafer's situation might not have believed that he had authority to stop plaintiffs' car. Although there is no case that supports his stop, I have found no case that held precisely that a stop in the circumstances he encountered would be held illegal. Indeed, the very fact that the question is close enough to go to the jury for decision means that it is not possible to say that the matter is so certain as to deprive defendant of his entitlement to qualified immunity. Reasonable people might disagree about the reasonableness of defendant Schafer's evaluation of the circumstances he confronted on February 3, 2001.

As odd as it may seem to find that an officer could reasonably undertake an unreasonable seizure, such a finding merely reflects the accommodation the Supreme Court has worked out between governmental need and individual freedom and acknowledges the difficulty that judges and law enforcement officers have in determining the constitutionality of particular searches or seizures. *Anderson*, 483 U.S.

at 644, 107 S.Ct. 3034. A conclusion that a judge can work out in a quiet office over a period of time is not necessarily one that a sheriff's deputy would reach on the spot. Because a reasonable jury could find that a reasonable officer could have come to the same conclusion Schafer did, I conclude that defendant Schafer is entitled to qualified immunity for his stop of plaintiffs' car.

### 2. Continued detention of car and occupants

▮▮▮▮ If defendant Schafer had a legitimate ground for stopping the car, it would have been reasonable for him to detain it and its occupants temporarily, but only for the length of time needed to effectuate the purpose of the stop. "The investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (citing *Brignoni–Ponce,* 422 U.S. at 881–82, 95 S.Ct. 2574; *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)). If the initial stop is legal, an officer is permitted to detain the vehicle long enough to check the identification of the driver and his passengers. *United States v. Gonzalez–Lerma,* 14 F.3d 1479, 1483 (10th Cir.1994) ("An officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation.") *See also Berkemer v. McCarty,* 468 U.S. 420, 439–40, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) ("officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions"; detainee is not obliged to respond).

▮▮▮▮ Assuming that it was legal for defendant Schafer to stop plaintiffs' car, once he learned that passenger Michael Guillen was wanted on a warrant, he would have been entitled to detain the car and its occupants long enough to find out whether the warrant was still in force. He could have required Guillen and the others to step out of the car. *Maryland v. Wilson,* 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997) (once law enforcement officer has lawfully stopped car, he may direct passengers to exit car during stop); *United States v. Tilmon,* 19 F.3d 1221, 1227 n. 3 (7th Cir.1994). His conduct became more questionable when he required Guillen to submit to a preliminary breath test. The Supreme Court has held that "[i]t is axiomatic that an incident search may not precede an arrest and serve as part of its justification." *Sibron v. New York,* 392 U.S. 40, 63, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). A breath test is a search under the Fourth Amendment. *Skinner v. Railway Labor Executives' Assn.,* 489 U.S. 602, 616, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) ("Subjecting a person to a breathalyzer test, which generally requires the production of alveolar or 'deep lung' breath for chemical analysis implicates similar concerns about bodily integrity and, like the blood-alcohol test we considered in *Schmerber [v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) ], should also be deemed a search.") (internal citation omitted).

Although many states, including Wisconsin, have enacted "implied consent" statutes that impose special requirements on drivers, defendants do not suggest that any similar statutes apply to passengers. In fact, defendants are silent on the subject of the legal justification for the administration of the breath test to Guillen. It is possible that defendant Schafer secured Guillen's consent or that he knew Guillen was not 21 when he smelled alcohol on his breath, in which case he might have had legally sufficient cause to subject him to a breath test. (I am not prepared to decide at this stage of the litigation what that

amount of cause might be.) The record does not provide enough facts to know why Schafer acted as he did and whether his actions were constitutionally reasonable.

If plaintiffs intend to pursue the issue of the breathalyzer test as it relates to plaintiff Liston, they should be prepared to discuss what standard must be met under federal law before an officer can constitutionally subject a passenger to a breath test. Presumably, a minor does not have to be intoxicated to be in violation of the law; she is in violation if she has consumed any alcohol at all outside the presence of her parent or guardian.

Although Guillen is not a plaintiff, I would have expected the parties to have proposed facts about his treatment by Schafer, since his arrest for underage drinking is the lynchpin of defendants' claim that they could search the vehicle without Gogola's consent; without the search and the discovery of the gin, plaintiff Gogola could not have been arrested and taken into custody. Nothing in the record suggests that defendants arrested Guillen on the outstanding warrant from Grant County or even discloses whether the warrant was still valid. As to plaintiffs Liston and Gogola, the parties' failure to propose facts is even less understandable. The record shows no factual basis on which to find that defendant Schafer acted properly in subjecting them to breath tests, assuming that the initial stop had been legal. Plaintiff Gogola was not driving erratically before he was stopped and there is no evidence that he displayed any indication of being intoxicated when defendant questioned him. As to plaintiff Liston, there is no evidence that defendant Schafer acted reasonably in giving her a breath test because the record is silent about the nature of the test, whether it was consensual or whether Schafer demanded it, whether defendant Schafer detected any signs of Liston's having con-

sumed alcohol and whether he knew her age before he gave her the test. With so many gaps in the evidence, it is not possible to determine whether defendant Schafer violated plaintiffs' rights not to be subjected to unreasonable searches, independently of the initial stop, by prolonging the stop without a legitimate reason, administering breath tests without sufficient cause, searching plaintiffs' car and arresting plaintiffs on the basis of improperly obtained evidence. There is enough in the record, however, to defeat a claim of qualified immunity as to these claims at this stage of the proceedings. Taking the facts in the light most favorable to plaintiffs, defendant Schafer administered breath tests to them without any reason to believe that he was authorized to do so, searched the vehicle in reliance on illegally obtained evidence (Guillen's blood alcohol reading), and arrested plaintiffs on the basis of illegally obtained evidence. No reasonable officer would have acted similarly.

### 3. *Arrest of plaintiff Liston*

Plaintiffs raise still another argument in support of their contention that defendant Schafer acted illegally in arresting plaintiff Liston once he had determined her blood alcohol level. This argument rests on the proposition that Wisconsin law creates an exception to the general prohibition against the consumption of alcoholic beverages by persons under 21. Wis. Stat. § 125.07(4)(b) permits underage persons to drink alcohol if they are in the company of a parent, guardian or spouse who has attained the legal drinking age. Citing this statute, plaintiffs argue that Schafer had no reason to arrest plaintiff Liston unless he knew she had not been consuming alcohol while with a parent. They extend their argument to defendant Iowa County, arguing that Schafer's allegedly unlawful act was

taken in conformity with a sheriff's department policy that underage persons arrested for alcohol-related offenses will be brought to the jail and booked. Defendants deny that Iowa County has a policy on arresting minors without determining whether they might have consumed alcohol with their parents. Whether such a policy exists is a fact in dispute.

It is well settled law that probable cause for arrest does not have to negate every possible legal defense the arrested person might have. Addressing the question whether a search could take place only if the evidence supporting probable cause were the type that would be admissible at trial, the Supreme Court has held that no such requirement is appropriate. "In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). It is possible, although not likely, that plaintiff Liston had been drinking alcohol at home with her parents before going out with plaintiff Gogola and the other occupants of the car. It is not *probable* that responsible parents would allow an underage child to drink at home before going out in a car on a snowy evening with her friends. Law enforcement officers are entitled to rely on probabilities.

If plaintiff Liston had indeed been drinking at home with her parents and if she had chosen to contest her forfeiture, she would have been free to argue that under Wis. Stat. § 125.07(4)(b), a minor cannot be ticketed for having alcohol in her system if the alcohol was consumed in the presence of a parent or guardian, even if she had later left their presence. Even if she is correct in her interpretation of the statute, however, it does not follow that defendant Schafer could not have arrested her without confirming that she had done her drinking with a parent, assuming, of course, that the arrest was otherwise legal.

### 4. *Vacha's alleged misrepresentation*

Defendant Vacha has not moved for summary judgment on plaintiffs' claim that he misrepresented facts to defendants Steffes and Hurlbert, either intentionally or negligently. The facts material to this claim are in sharp dispute. It will be up to the jury to decide what Vacha said and did.

 Plaintiffs argue that Steffes and Hurlbert were not entitled to rely on Vacha's statements to them because he was lying about having smelled marijuana. Whether defendant Vacha's statements to defendants Steffes and Hurlbert were sufficient to give them reason to strip search plaintiffs is one question; whether these defendants should have known he was lying or should have any responsibility for his lie is another one. In the absence of any showing by plaintiffs that defendants Steffes and Hurlbert knew or should have known that Vacha was lying, they cannot be held liable for his lie.

### 5. *Reasonableness of strip search*

Regardless whether defendant Schafer acted legally in stopping and arresting plaintiffs, it is necessary to determine whether defendants Steffes and Hurlbert acted properly in strip searching them. That determination must be made on the basis of the facts known to these defendants; they cannot be charged with knowing whether the underlying stop and arrest were valid or not.

 In this circuit, the law is well settled that strip searches may be performed on persons taken into custody on a misde-

meanor or traffic violation only if the person is going to be housed in the general jail population and not simply detained for release upon completion of the booking process, *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1273 (7th Cir.1983), or if officials have a reasonable suspicion that the arrested person is concealing weapons or contraband. *Id.* at 1273; *Kraushaar v. Flanigan*, 45 F.3d 1040, 1045 (7th Cir. 1995). Strip searches are "demeaning, dehumanizing, undignified, unpleasant, embarrassing, repulsive, signifying degradation and submission." *Mary Beth G.*, 723 F.2d at 1272.

 Defendants do not suggest that they suspected plaintiffs of being armed. It is undisputed that plaintiffs were going to be released as soon as they were booked. The only way defendants can justify the searches is by establishing that defendants Steffes and Hurlbert had a reasonable suspicion that plaintiffs were concealing contraband. *Mary Beth G.*, 723 F.2d at 1273, suggests that the amount of reasonable suspicion should approach probable cause: "The more obtrusive the search, the closer governmental authorities must come to demonstrating probable cause for believing that the search will uncover the objects for which the search is conducted." The court seems to have assumed that a search for contraband was legitimate if reasonable suspicion existed. It did not discuss what justification there might be for conducting a strip search for controlled substances on non-intoxicated persons who will be kept in holding cells and never placed with jail inmates. *Id.* The two reasons for permitting such searches are to protect against the dissemination of controlled substances in the general jail population and to discover evidence relevant to the charges on which the person has been arrested. The first reason does not apply if the person will not be mixing with the general jail population. The second reason does not apply unless the discovery of contraband would be relevant to the charges. Plaintiffs were not charged with drug distribution, manufacture or possession and they were not intoxicated. If they had been intoxicated, there would have been at least the possibility that the intoxication was drug-induced, which would make the discovery of drugs relevant to the charge against them. *Kraushaar*, 45 F.3d at 1046 ("an officer cannot rule out the possibility that a DUI is drug-related").

"Whether a suspicion is reasonable depends upon such factors as 'the nature of the offense, the arrestee's appearance and conduct, and the prior arrest record.'" *Id.* at 1045 (quoting *Giles v. Ackerman*, 746 F.2d 614, 617 (9th Cir.1984)). Defendants do not argue that anything about plaintiffs' appearance, conduct or offense supports a reasonable suspicion that they had concealed contraband on their persons. Defendants refer to plaintiff Gogola's prior arrest record but do not assert that either Steffes or Hurlbert knew of the record when they made the decision to search him. The full sum of the evidence that defendants Steffes and Hurlbert had was Vacha's statement to them that he had smelled marijuana and that no marijuana had been found in the car. Defendants argue that Vacha told defendants Steffes and Hurlbert that he had smelled marijuana *on plaintiffs;* plaintiffs dispute this and nothing in the record supports it. Defendant Steffes testified in her deposition that Vacha told her he had smelled marijuana *on the subjects;* she cannot recall whether he said which subjects. Steffes dep., dkt. # 14, at 8–9. Defendant Vacha testified that he told defendant Hurlbert that he had smelled marijuana. Vacha dep., dkt. # 15, at 27–28. Vacha does not recall telling Hurlbert anything else. *Id.* at 28. Defendant Hurlbert testified that he heard from defendant Steffes that Vacha had detected an odor of marijuana on the sub-

jects, Hurlbert dep., dkt. # 12, at 16, but Hurlbert did not know which subjects. *Id.*

It is doubtful whether merely smelling marijuana on a person's clothing creates a reasonable suspicion that the person has marijuana concealed on his person at that time. Anyone who has ever spent time in a smoky bar knows how long the smell of cigarette smoke lingers on clothes. Assuming marijuana smoke is similar, smelling it would not reveal when the person had last smoked marijuana or whether he or she had been the smoker or had just been around smokers. In this case, it is particularly troublesome that defendants place reliance on the smell of marijuana when it was so faint that neither Steffes nor Hurlbert was able to smell it and it is undisputed that plaintiff Liston did not smell of marijuana. A faint smell of marijuana does not create a strong ground for suspicion that the person is currently in possession of marijuana.

In this case, however, it is disputed whether defendants Steffes and Hurlbert had even the information that plaintiffs or their clothes smelled of marijuana. It is unclear whether Vacha made it clear to defendants Steffes or Hurlbert that he had smelled marijuana on either of the plaintiffs. It is undisputed that neither Steffes nor Hurlbert detected any marijuana smell themselves. Moreover, the record contains no evidence that plaintiffs were intoxicated. *Cf. Kraushaar,* 45 F.3d at 1046 (intoxication could be result of drugs other than alcohol; together with other information it can support a strip search). Defendants did not have any information that either plaintiff had been seen trying to hide something in his clothing. *Cf. id.* at 1043, 1046 (when Kraushaar arrested, officer saw him making furtive hand gestures around his waist, suggesting he was trying to put something down his pants; this plus intoxication gave "rise to a reasonable suspicion that Kraushaar may have been try-

ing to hide drugs"). It will be the jury's task to decide whether, when defendants made their decision to perform strip searches on plaintiffs, they were acting on any particularized suspicion. *Cf. United States v. Brack,* 188 F.3d 748, 758 (7th Cir.1999) (officer had reasonable suspicion to subject suspect in crack cocaine distribution conspiracy to strip search when officer arrested suspect immediately after suspect left hotel room for which police had warrant to search for evidence of drug dealing; police had received information that person matching description of suspect was involved in conspiracy; and suspect asked for toilet paper and a chance to relieve himself as soon as he was brought to police station). A reasonable jury could find that defendants Steffes and Hurlbert had no particularized, reasonable suspicion to conduct strip searches.

If, however, defendants Steffes and Hurlbert believed that Vacha had smelled marijuana on each of the plaintiffs, defendants would be entitled to qualified immunity. As of February 3, 2001, reasonable officers in their position could have believed it was reasonable to conduct a strip search of an arrested person that a trained law enforcement officer told them smelled like marijuana. The law was not so clearly established on this point as to give defendants fair warning that their actions might be illegal.

### 6. *Conduct of strip search*

 Plaintiffs contend that defendant Steffes violated plaintiff Liston's constitutional rights not only by subjecting her to a strip search but in the manner in which she conducted the search. Plaintiffs object only to defendant Steffes's failure to close the door to the room completely. Defendants deny that anyone could have seen into the room while plaintiff was undressing, even if the door were not closed

completely. If defendant Steffes did not protect plaintiff Liston from being seen while she was undressing, plaintiff Liston may have an independent constitutional claim against defendant Steffes. However, I cannot determine whether she has such a claim because the material facts are in dispute. This issue must be left for the jury.

### 7. Liability of defendant Iowa County

■ Defendants asked the court to dismiss the claims against defendant Iowa County on the ground that plaintiffs could not demonstrate that an employee of the sheriff's department violated their rights and thus could not establish any liability for indemnification on the part of the county. Now that I have found that at least some of plaintiffs' claims are going forward against sheriff's department deputies, defendants' request will be denied.

Plaintiffs have sued defendant Iowa County in its own right, on the ground that it has a policy of arresting persons under the legal drinking age of 21 who have consumed alcohol without determining whether they did so in the presence of a parent or guardian. Plaintiffs argue that this policy is illegal because it fails to take into consideration the possibility that the underage drinkers might have been with their parents when they consumed the alcohol but left their company afterwards and did not have anything more to drink. Defendants dispute the existence of a policy but assert that if there were one, it would be legal. As I discussed earlier, it is not unconstitutional for officers to arrest underage drinkers who are not with their parents. The officers can rely on the probability that the underage drinker did his drinking outside his parents' presence.

Defendants argue that the county need not consider the possibility that a parent or guardian was present because the statute does not permit minors to drink with their parents and then leave. Wis. Stat. § 125.07(4)(b) is not explicit on this point. It says only that any underage person is guilty of a violation if he "knowingly possesses or consumes alcohol beverages" when not accompanied by his or her parent, guardian or spouse who has attained the legal drinking age. Because it is not necessary to interpret the statute in order to resolve plaintiffs' claim against the county, I will leave the statute's interpretation to the state courts, which are far better suited to the task.

### ORDER

IT IS ORDERED that the motion for summary judgment filed by defendants Iowa County, Pam Steffes, Keith Hurlbert and Phillip A. Schafer is GRANTED with respect to plaintiffs' claims for money damages against defendant Schafer for stopping their car; it is DENIED in all other respects. Plaintiffs' remaining claims, defendants' affirmative defense of qualified immunity as to defendants Steffes and Hurlbert and the issue of damages will be determined at trial.